UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SHERIMA BELL et al.,<br><br>Defendants. | Criminal No. JKB-16-485 |

**EMERGENCY MOTION FOR**
**IMMEDIATE TRANSFER TO HOME CONFINEMENT**

The Defendant, Erica Cook, respectfully requests that the Court release her from a halfway house that unreasonably exposes its residents to the risk of infection by COVID-19, and allow her to serve the remainder of her sentence (which is less than four months) in home confinement. Ms. Cook is already scheduled to be released to home confinement in just over a month. Undersigned counsel informed the government of Ms. Cook's proposed motion and advised the government that Judge Richard Bennett ordered immediate release for another resident held in the same halfway house as Ms. Cook. Undersigned counsel did not get a response in time before filing this motion.

**BACKGROUND**

**I.      Ms. Cook's Residence and Status**

On February 9, 2017, Ms. Cook pleaded guilty to one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d). On October 2, 2018, this Court sentenced Ms. Cook to 27 months' incarceration. ECF 1599. Ms. Cook self-surrendered on February 15, 2019 and

1

served the first 11 months of her sentence at FPC Alderson in Alderson, West Virginia without incident.

On January 15, 2020, Ms. Cook was transferred to a halfway house, Volunteers of America Residential Re-Entry Center ("VOA") in Baltimore, Maryland. VOA aims to "assist returning citizens in making successful transitions back into their communities," including by providing "employment readiness" and other programming. Residential Re-Entry Center, https://tinyurl.com/wqpqdw4. The VOA services adult men and women, including elderly people, who live in dorm-style housing and must convene in common areas to eat meals and for programming. Some VOA residents are permitted to leave the facility to work and return later in the day. There are no in-house medical professionals at VOA.

Ms. Cook is due to be transferred to home confinement in just over a month, on April 22, 2020. Ms. Cook's official release date, on account of her good behavior as an inmate and successful completion of the Residential Drug Abuse Program (RDAP), is July 12, 2020. When Ms. Cook is released from VOA, she will have a stable home and will live with her two parents and young daughter in Girdletree, Maryland.

## II. The COVID-19 Pandemic

In the two months since Ms. Cook arrived at VOA, COVID-19 has spread across the globe and throughout the United States. Policymakers at every level of government have recognized the dire risks of COVID-19. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. Bill Chappell, *Coronavirus: COVID-19 is Now Officially a Pandemic*, WHO Says, NPR (Mar. 11, 2020), https://tinyurl.com/tpy4v8s. President Trump, Governor Larry Hogan, and Baltimore Mayor Bernard Young have followed suit and declared COVID-19 an emergency at the national, state, and local levels, respectively. *See* Lisa

Mascaro, *Trump declares virus emergency; House passes aid package*, Associated Press (Mar. 14, 2020), https://tinyurl.com/wqocqmg; Decl. of State of Emergency and Existence of Catastrophic Health Emergency—COVID-19 at 2 (Mar. 5, 2020), https://tinyurl.com/vw9qlof; Scott Dance, *Maryland reports first coronavirus death as cases surge and hospitals plan to add beds*, Baltimore Sun (Mar. 18, 2020), https://tinyurl.com/r2l2gag.

To mitigate the COVID-19 pandemic, governmental authorities in the United States have issued guidelines and advice for citizens to follow. For example, the CDC's guidance document recommends the following:

- "Work or engage in schooling FROM HOME whenever possible."
- "AVOID SOCIAL GATHERINGS in groups of more than 10 people."
- "Avoid eating or drinking at bars, restaurants, and food courts."
- "AVOID DISCRETIONARY TRAVEL, shopping trips, and social visits."
- "DO NOT VISIT nursing homes or retirement or long-term care facilities unless to provide critical assistance."

CDC, *The President's Coronavirus Guidelines For America* at 2 (emphasis in original), https://tinyurl.com/v9kngde.

### III. The Pandemic's Effect on Communal Living Spaces

Communal living spaces present especially serious risks related to COVID-19. One highly publicized example is nursing homes. These communities are "at risk because residents live in tight proximity, with staff interacting closely with them." Jon Kamp, *Coronavirus Outbreaks Spreading in Nursing Homes*, The Wall Street Journal (Mar. 19, 2020), https://tinyurl.com/uqu4ssc. The CDC's guidelines acknowledge this by warning people not to visit "nursing homes or retirement or long-term care facilities." As of today, over 100 residents

of such facilities, from Kirkland, Washington to New Orleans, Louisiana, have died from COVID-19 infections. *Id.*

Custodial living spaces, such as prisons and jails, present the same risks. Incarcerated individuals are more vulnerable to contract the disease because they live in cells with multiple people in close quarters, are regularly required or allowed to inhabit communal spaces for eating, bathing, or awaiting transport to or from court, and are nearly always in close contact with other people. The active vulnerability of the prison population in turn compounds the risk to the public health because lawyers, correctional officers, and other staff are coming into and out of the prison and therefore can carry to the outside world any diseases that festered inside. Understanding these concerns, governmental authorities increasingly are attempting to release prisoners affected by COVID-19. *See, e.g.*, Julia Marsh, *NYC to begin releasing inmates amid coronavirus outbreak*, New York Post (Mar. 18, 2020), https://tinyurl.com/trba737. Courts around the country are addressing issues relating to incarceration; for example, the extension of self-surrender dates due to COVID-19.

Although less widely publicized, halfway houses present similar, perhaps worse, challenges. Residents in halfway houses typically live in close quarters with many other people, just like in nursing homes and prisons. Residents in halfway houses eat, socialize, and participate in programming in common areas, just like in nursing homes and prisons. Similarly, workers and residents frequently come and go from halfway houses, potentially carrying with them any diseases or viruses to which they were exposed. An additional risk in halfway houses, though, is that the residents themselves are sometimes permitted to leave for the day, take public transportation to a place of employment, and return later in the day. Halfway houses also may not have in-house medical professionals to care for individuals who become sick. For all of

these reasons and more, halfway house operators are, or should be, "scrambling for answers . . . to figure out what" the COVID-19 pandemic and "the latest wave of public health orders mean for the hundreds of people jammed into close conditions at community corrections and treatment facilities." Rachel Dissell, *Coronavirus concerns leave halfway houses scrambling for guidance, ways to protect residents, staff and the public*, Cleveland.com (Mar. 17, 2020), https://tinyurl.com/u77rgbs.

## ARGUMENT

Ms. Cook should be released immediately from VOA and allowed to serve the remainder of her sentence in home confinement under conditions left to the discretion of the Bureau of Prisons and/or the U.S. Probation Office. VOA is not a safe facility for Ms. Cook during the COVID-19 pandemic. The very nature of the VOA facility, and many halfway houses like it, runs contrary to the consistent guidance from governmental and other officials tasked with preventing further spread of COVID-19.

A normal day at VOA necessarily involves deviating from numerous CDC guidelines for handling COVID-19. *First*, residents like Ms. Cook are consistently exposed to "groups of more than 10 people" living and socializing in confined spaces; there is no practical way to avoid other people. *Second*, despite the CDC's advice to "avoid eating or drinking at bars, restaurants, and food courts," residents at VOA are required to eat in common areas alongside more than 10 other people. The only eating utensils available to the residents must be retrieved, by hand, from a box that holds all the utensils and with which everyone at VOA must eventually come into contact. *Third*, while the CDC tells the American public to "work . . . FROM HOME whenever possible," residents of the VOA are permitted to leave for the day to work and return to the facility later, after potentially having been exposed to COVID-19 or people who have it. The residents' ability

5

to come and go also may run afoul of the CDC's directive to "AVOID DISCRETIONARY TRAVEL, shopping trips, and social visits." In sum, VOA's failure to enforce precautionary measures promulgated by the CDC, and other health authorities, threatens the health of its residents, including Ms. Cook.

These are not hypothetical concerns: multiple residents of VOA have fallen ill during the COVID-19 pandemic. Among those residents were people with symptoms consistent with a diagnosis of COVID-19. Recently, a male VOA resident had to be transported by ambulance to the hospital for treatment of such symptoms. Additionally, a female VOA resident has been consistently coughing—again, a potential sign of a COVID-19 infection. VOA employees have not informed the residents, including Ms. Cook, whether the other residents were tested for COVID-19 or if they in fact were diagnosed with the disease. Even more, there are no medical professionals available to identify and treat COVID-19 symptoms should they arise.

The persistent risks to Ms. Cook's health outweigh any potential benefit, if any, to keeping Ms. Cook at VOA. Ms. Cook is due to leave VOA and commence home confinement in April. In the interim month, Ms. Cook's ability to take advantage of VOA's benefits has been effectively eliminated. She cannot seek outside employment training or opportunities due to the new reality created by the COVID-19 pandemic that has shuttered businesses and forced everyone inside. On the other hand, even if Ms. Cook was able to isolate herself from other VOA residents—which she cannot—that would negate any benefits of in-house programming that would require Ms. Cook to expose herself to large groups of people in violation of the CDC's and other governmental guidelines.

Nor is Ms. Cook's request unique. The same relief that Ms. Cook seeks was granted earlier today, on an emergency basis, to another, now-former resident of VOA. *See* ECF 506 at 1, *United States v. Rice*, No. 1:17-cr-00127-RDB (D. Md.). The former VOA resident explained that VOA "has been permitting individuals to come in and out of the facility, despite the ongoing health crisis and the continuing spread of the novel coronavirus." ECF 505 at 1, *Rice*, No. 1:17-cr-00127-RDB. The former resident likewise relied on the fact that another current VOA resident has been "sick" and "coughing." *Id.* Judge Bennett immediately granted the former resident's immediate release from VOA and ordered that she "reside at a residence approved by the U.S. Probation Office." *See* ECF 506, *Rice*, No. 1:17-cr-00127-RDB. Ms. Cook has less time left at VOA (just over a month) than the defendant in *Rice* (who had a month and a half remaining).

Ms. Cook has been a model citizen and inmate since pleading guilty and being sentenced by the Court in this case. If Ms. Cook is placed in home confinement, she will return to a supportive household in Girdletree, Maryland, where her parents and young daughter reside. There is little, if any, benefit to keeping Ms. Cook in dangerous conditions at VOA for another month when she is unable to seek employment under the current conditions. Thus, the dire risks to Ms. Cook's health counsel in favor of expediting Ms. Cook's transfer to home confinement where she can reunite with her young daughter and family.

## **CONCLUSION**

Ms. Cook respectfully requests that the Court order her immediate release from VOA and allow her to serve the remainder of her sentence in home confinement. Ms. Cook submits that the details of the home confinement can be left to the discretion of the U.S. Probation Office.

Respectfully submitted,

Dated: March 19, 2020 */s/ Brian L. Stekloff*

Brian L. Stekloff
Aleshadye Getachew
Hayter L. Whitman

WILKINSON WALSH LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
(202) 841-4000